IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TAMARA VILLANUEVA, | ) | 4:11CV3185 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| CITY OF SCOTTSBLUFF, and | ) | |
| ALEX MORENO, Individually and | ) | |
| in his official capacity as Chief of | ) | |
| Police, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before me on Defendants' Motion for Summary Judgment. (Filing No. 63.) Also pending is Defendants' Motion to Strike. (Filing No. 72.) For the reasons discussed below, I will deny the Motion to Strike and grant the Motion for Summary Judgment in part.

## I. BACKGROUND

Plaintiff Tamara Villanueva ("Villanueva") brings this 42 U.S.C. § 1983 action against the City of Scottsbluff, Nebraska (the "City"), and its chief of police, Alex Moreno ("Moreno"), in his individual and official capacities for alleged violations of her rights to equal protection and substantive due process, as well as for negligent infliction of emotional distress under Nebraska law. (Filing No. 20.) Villanueva's claims stem from Defendants' alleged failure to respond to her reports of assault and harassment by her ex-husband, as well as harassment and serious threats directed at Villanueva and her family that were supposedly orchestrated by Moreno. (*Id.*)

On March 16, 2012, Defendants filed a Motion to Dismiss (filing no. 21) and Motion to Strike (filing no. 23) Villanueva's claims for punitive damages. On June 25, 2012, I granted Defendants' Motion to Dismiss in part and dismissed Villanueva's

claim for negligent infliction of emotional distress against Moreno for acts taken within the scope of his employment. (Filing No. 27 at CM/ECF p. 13.) I also granted Defendants' Motion to Strike and struck Villanueva's claims for punitive damages against all Defendants for acts alleged to constitute negligent infliction of emotional distress under Nebraska law. (*Id*. at CM/ECF p. 14.)

On September 12, 2013, Defendants filed a Motion for Summary Judgment along with a Brief and Index of Evidence in Support. (Filing Nos. 63, 64, and 65.) Villanueva responded by filing a Brief and Index of Evidence in Opposition. (Filing Nos. 66, 67, and 68.) Thereafter, Defendants filed a Motion to Strike certain statements and audio recordings in Villanueva's Index of Evidence, as well as portions of Villanueva's Brief. (Filing No. 72.) Defendants filed a Brief in Support of this Motion and as a Reply to Villanueva's Brief in Opposition, as well as another Index of Evidence. (Filing Nos. 73 and 74.) Villanueva filed a Brief in Opposition to the Motion to Strike (filing no. 75) and Defendants filed an additional Reply Brief (filing no. 76). Defendants' Motion to Strike and Motion for Summary Judgment are now ripe for a decision.

## II.  MOTION TO STRIKE

On October 25, 2012, Defendants filed a Motion to Strike. (Filing No. 72.) In the Motion, Defendants argue that certain statements and audio recordings in Villanueva's Index of Evidence, as well as portions of Villanueva's Brief, are inadmissable "hearsay, lack sufficient foundation, immaterial, and/or lack veracity." (*Id*. at CM/ECF pp. 1-2.) Defendants ask me to strike these statements, audio recordings, and portions of Villanueva's Brief. (*Id*. at CM/ECF p. 3.)

Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial–it

is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (emphasis in original) (concluding the district court did not abuse its discretion in overruling an objection to evidence based on hearsay where the objecting party failed to argue that the information could not have been presented in an admissible form at trial); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (concluding "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form"); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, n.17 (3d Cir. 1995) (stating the rule in the Third Circuit "is that hearsay statements can be considered in a motion for summary judgment if they are capable of being admissible at trial"). Indeed, Rule 56 "permits a party to object to evidence cited by the other party at the summary judgment stage and requires the Court to make a determination regarding whether the evidence could be presented at trial in an admissible form." *Wiley v. RockTenn CP, LLC*, No. 4:12-cv-00266-KGB, 2013 WL 5567966, at *11 (E.D. Ark. Oct. 9, 2013); *See* Fed. R. Civ. P. 56(c)(2).

Here, Defendants assert that numerous statements, audio recordings, or portions of Villanueva's Brief are either "hearsay, lack foundation, immaterial, and/or lack veracity." (Filing No. 72 at CM/ECF p. 2; Filing No. 76 at CM/ECF pp. 5-26.) Defendants' arguments are based on Villanueva's evidence in its current form, but they have not shown, nor do they argue, that Villanueva *cannot* present the evidence in a form that would be admissible at trial. Indeed, Villanueva does not rely on evidence, that, on its face, presents evidentiary obstacles that would prove insurmountable at trial. Moreover, as discussed below, even if I consider the evidence in accordance with the summary judgment standards, Defendants are entitled to summary judgment on Villanueva's federal claims. Accordingly, Defendants' Motion to Strike is denied.

## III.  MOTION FOR SUMMARY JUDGMENT

### A.      Summary Judgment Standard

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).  After the movant has demonstrated the absence of a genuine issue of material fact, the nonmovant must respond by submitting evidence that sets out specific facts showing that there is a genuine issue for trial.  *Id*.  In doing so, the nonmovant must substantiate her allegations with "sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy." *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)).  "A mere scintilla of evidence is insufficient to avoid summary judgment."  *Id*.  "The basic inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Jackson*, 643 F.3d at 1085 (quoting *Torgerson*, 643 F.3d at 1042).

### B.      Undisputed Material Facts

1.      Plaintiff Tamara Villanueva is a female citizen and resident of the City. (Filing No. 20 at CM/ECF p. 2.)

4

2.      Villanueva has lived in Scottsbluff for 41 years. (Filing No. 65-2 at CM/ECF p. 1.)  She has lived at 1409 East 15th Street in Scottsbluff since August 28, 1998.  (*Id*.)

3.      The City is a political subdivision duly formed and existing under Nebraska law.  (Filing No. 20 at CM/ECF p. 2; Filing No. 29 at CM/ECF p. 2.) Defendant Alex Moreno served as the Chief of Police for the City from September 2005 to October 1, 2012. (Filing No. 65-5 at CM/ECF pp. 3-5.)

4.      During the summer of 2008, Villanueva complained about her then-husband to the Scottsbluff Police Department communications and two officers responded.  (Filing No. 65-2 at CM/ECF p. 4.)  Villanueva told the responding officers that her husband Alvaro Villanueva Jr. had gotten mad at her, threw an Old Spice deodorant stick at her, hitting her in the ankle, and told her "if he couldn't have me, nobody would, and he was going to kill me. He was going to smash my head in." (*Id*. at CM/ECF pp. 4-5.)

5.      In October 2008, Villanueva and a friend first thought about setting up a neighborhood watch group.  (*Id*. at CM/ECF p. 8.)  From October 2008 to February 2009, Villanueva worked with then-Police Chief Moreno to establish the group and set up their first meeting, which took place on March 26, 2009.  (*Id*. at CM/ECF p. 9.) Moreno appointed Villanueva as the contact person for the group.  (*Id*.)  Moreno also set the boundaries for the neighborhood watch area.  (*Id*. at CM/ECF p. 10.)

6.      As the contact person for the neighborhood group, Villanueva made frequent calls to the Police Department and those calls were acted upon by the Police Department.  (Filing No. 20 at CM/ECF p. 3.)

7.      From March 2009 until February 2, 2011, when Villanueva resigned as the contact person for the neighborhood watch group, she made more than 100 calls. (Filing No. 65-2 at CM/ECF pp. 9-10.)

5

8.      On or about late August 2010, Villanueva met with Moreno in his office and disclosed that she had been abused by her ex-husband. (Filing No. 20 at CM/ECF p. 3; Filing No. 29 at CM/ECF p. 2.)  Villanueva also talked with Moreno about her personal history with domestic violence. (Filing No. 65-5 at CM/ECF pp. 12-13.)

9.      In October 2010, Villanueva and Moreno attended a neighborhood watch meeting at a local church. (Filing No. 20 at CM/ECF p. 4; Filing No. 29 at CM/ECF p. 3.)

10.     Villanueva claims Moreno kissed her at the neighborhood watch meeting, and thereafter started sending her sexually explicit text messages. (Filing No. 65-2 at CM/ECF p. 14; Filing No. 20 at CM/ECF p. 4.)  Villanueva continued to talk to Moreno, text him, and have contact with him. (Filing No. 65-2 at CM/ECF pp. 15-16.)

11.     On October 26, 2010, Villanueva had an affair with Moreno at a lake house. (*Id*. at CM/ECF p. 16.)  Moreno organized where and when they would meet. (*Id*.)  Villanueva thought about not going, but ultimately decided to have the affair. (*Id*. at CM/ECF p. 17.)  Moreno took that day off and drove his personal car to the lake house. (Filing No. 65-5 at CM/ECF pp. 14-16.)

12.     On or about November 15, 2010, Moreno emailed Villanueva to arrange for them to have sex again.  Moreno and Villanueva had sex that afternoon at the same lake house. (Filing No. 20 at CM/ECF p. 5; Filing No. 29 at CM/ECF p. 3; Filing No. 65-2 at CM/ECF p. 19.)

13.     On or about November 18, 2010, Moreno contacted Villanueva indicating that he was "all jacked up and you on my mind!" (Filing No. 20 at CM/ECF p. 5; Filing No. 29 at CM/ECF p. 3.)

14.    On or about November 25, 2010, Moreno and Villanueva e-mailed back and forth messages of a sexual content.  (Filing No. 20 at CM/ECF p. 5.)

15.    However, after November 15, 2010, Villanueva refused to have sex again.  (*Id*.; Filing No. 65-2 at CM/ECF p. 20.)

16.    Villanueva claims she started receiving phone calls threatening her to stay away from Moreno in December 2010 or January 2011, but she was not able to recognize who called her and did not report the calls.  (Filing No. 65-2 at CM/ECF p. 24.)

17.    In January 2011, Villanueva told a woman in her neighborhood watch group about her affair with Moreno.  (*Id*. CM/ECF pp. 21-22.)

18.    On or about February 2, 2011, Villanueva resigned as the contact person position for the neighborhood watch group because she needed to protect her mental and physical health.  (Filing No. 20 at CM/ECF p. 6; Filing No. 29 at CM/ECF p. 4.)

19.    On February 25, 2011, Villanueva sent an email to Moreno stating she was no longer attracted to Moreno but wanted to continue to be friends.  (Filing No. 65-3 at CM/ECF p. 37; Filing No. 65-2 at CM/ECF pp. 38-39.)

20.    In March 2011, the woman who knew about Villanueva's affair with Moreno told Villanueva's ex-husband about the affair.  (Filing No. 65-2 at CM/ECF p. 23.)

21.    On March 7, 2011, Villanueva and three other neighborhood watch representatives met with City Manager Rick Kuckkahn to inform him of problems in the neighborhood watch group and with Moreno.  (Filing No. 65-6 at CM/ECF pp. 3-11, 18-19.)  Kuckkahn met with Moreno the next day to discuss the meeting.  (*Id*. at CM/ECF pp. 20-21.)

7

22.     At some point, Villanueva also reported to Kuckkahn her concerns that when she would call the Police Department, they would not record her calls.  (*Id*. at CM/ECF p. 12.)

23.     Between October 1999 and August 31, 2011, Villanueva made 219 calls to the Police Department to report suspicious activity and as the neighborhood watch person for her neighborhood. (Filing No. 20 at CM/ECF p. 7; Filing No. 29 at CM/ECF p. 4.)

24.     Between December 1, 2010, and May 26, 2011, Villanueva called the Scotts Bluff County Communications Center 17 times.  (Filing No. 65-8 at CM/ECF p. 2; Filing No. 65-9 at CM/ECF pp. 3-38.)

25.     Between June 20, 2011, and July 6, 2012, Villanueva called the Communications Center 17 times.  (Filing No. 65-8 at CM/ECF p. 2; Filing No. 65-9 at CM/ECF pp. 3-38.)

26.     In her Second Amended Complaint, Villanueva claims that "on or about March 16, 2011, while the Villanueva was out of town, she received a call that there were various vehicles parked in front of the Plaintiff's home, watching the house. When the Villanueva returned home, the vehicle pulled away. The Plaintiff called to report the suspicious activity. No action was taken by the police."  The Police Department has a report about Villanueva's call and Officer Herbel's response to the call.  (Filing No. 20 at CM/ECF pp. 7-8; Filing No. 65-9 at CM/ECF p. 39.)

27.     In her Second Amended Complaint, Villanueva claims: "on or about March 30 [, 2011,] the Plaintiff received another harassing phone call. The caller stated 'you better be keeping your mouth shut, we know where you are.' The Plaintiff reported this to the police, no action was taken."  There is a report on this incident by Police Officer Wescher. The officer reported that "Tamara Villanueva did not

8

recognize the voice. No evidence/suspects available."  (Filing No. 20 at CM/ECF p. 8; Filing No. 65-9 at CM/ECF pp. 41-42.)

28.    In March 2011, Villanueva complained to the State of Nebraska Office of Public Counsel/Ombudsman regarding Villanueva telling "a friend about the affair [with the Scottsbluff Police Chief] and the friend told [her] ex-husband who then texted and harassed Mr. Moreno about the situation." The State Office of Public Counsel/Ombudsman informed Villanueva that her complaint was not "within our jurisdiction."  (Filing No. 65-2 at CM/ECF p. 47; Filing No. 65-3 at CM/ECF p. 38.)

29.    In May 2011, Villanueva complained to the Office of the Nebraska Attorney General about Moreno and the Police Department not responding to her calls.  On August 2, 2011, the Attorney General's office told her they could not do anything because it was a "private civil matter."  (Filing No. 65-2 at CM/ECF p. 36; Filing No. 65-3 at CM/ECF p. 15; Filing No. 65-4 at CM/ECF p. 1.)

30.    On May 11, 2011, Villanueva filed a petition and affidavit to obtain a harassment protection order against Moreno.  (Filing No. 65-3 at CM/ECF pp. 19-24.) The court denied the petition because it contained "insufficient factual allegations." (*Id*. at CM/ECF p. 23.)

31.    On June 22, 2011, Kuckkahn received copies of e-mails from Villanueva between her and Moreno that substantiated her claim that Moreno and Villanueva had an intimate relationship.  Before this meeting, Kuckkahn had not heard from anyone that Moreno and Villanueva had been involved in an intimate relationship.  (Filing No. 65-6 at CM/ECF pp. 13-14.)

32.    After Kuckkahn learned of the tension between Moreno and Villanueva, he contacted the police captains and asked "are we servicing this woman in a way that

9

we would service anybody else," and their response was "yes, we were." (*Id*. at CM/ECF pp. 15-16.)

33.    Kuckkahn asked the captains to look at the example dates that Villanueva reported a lack of response to her complaints.  Kuckkahn was satisfied with the response Captain Spencer gave him.  (*Id*. at CM/ECF pp. 16-17, 25.)

34.    On June 23, 2011, Villanueva sought a harassment protection order against her ex-husband in the District Court of Scotts Bluff County, Nebraska. (Filing No. 65-2 at CM/ECF p. 30; Filing No. 65-3 at CM/ECF pp. 9-14.)  The court issued the protection order that same day.  (Filing No. 65-10 at CM/ECF p. 12.)

35.    In June 2011, Villanueva contacted the North Platte office of the Federal Bureau of Investigation ("FBI") regarding a complaint against Moreno.  (Filing No. 65-4 at CM/ECF pp. 2-55.)  The FBI finished their investigation of Moreno at the end of 2011 and no charges were brought against Moreno.  (Filing No. 65-3 at CM/ECF p. 3.)

36.    On August 15, 2011, Villanueva called the Police Department regarding a domestic violence complaint. Officer Broderick arrested Villanueva's ex-husband, transported him to the Scotts Bluff County jail, and prepared a report.  (Filing No. 65-8 at CM/ECF p. 5; Filing No. 65-10 at CM/ECF pp. 9-13.)

37.    The last meeting of the neighborhood watch group was held on October 27, 2011.  (Filing No. 65-2 at CM/ECF p. 41.)

38.    Villanueva never missed a neighborhood watch meeting from the beginning until it ended.  (*Id*. at CM/ECF p. 40.)

39.     On or about January 3, 2012, Villanueva came to the Police Department to make a report about threatening phone calls that she believed were made either by Moreno or someone at his bequest.  Villanueva also reported her concerns to the Nebraska State Patrol.  (Filing No. 20 at CM/ECF p. 9; Filing No. 29 at CM/ECF p. 6.)

40.     Villanueva has no audio recording or written statements from Moreno making any defamatory statements about her.  (Filing No. 65-2 at CM/ECF p. 42.) No one has told Villanueva that Moreno asked people to harass her.  (*Id*. at CM/ECF p. 25.)

41.     Villanueva testified that the incidents underlying her complaints stopped at the beginning of 2012, after the State Patrol got involved and they were no longer reported to the Police Department.  (*Id*. at CM/ECF p. 26.)

42.     In her Second Amended Complaint, Villanueva claims "[o]n January 14, 2012, someone was trying to break into the plaintiff's home while she was home with the children.  Plaintiff called the state patrol immediately and was instructed to call the local police department for a uniformed officer.  When 'Plaintiff called the police department she was placed on hold for six minutes, thirty-seven seconds and then was hung up on.  When she called back, she was informed that it was shift change and an officer would come when they were done with the shift change."  According to the the Communications Center record, a Scottsbluff police officer arrived at Villanueva's residence within one minute and 20 seconds after being dispatched.  (Filing No. 20 at CM/ECF p. 9; Filing No. 65-8 at CM/ECF p. 4; Filing No. 65-10 at CM/ECF p. 1.)

43.     The Police Department has a policy on domestic violence and abuse. (Filing No. 65-5 at CM/ECF p. 6.)  The policy was in existence before Moreno became Police Chief, and he later updated it.  (*Id*.)  This policy establishes guidelines

for officers in responding to domestic violence calls. Officers are expected to do the following pursuant to this policy:

    a.    Establish arrests and prosecution as a preferred means of police response to domestic violence.

    b.    Take appropriate action for any violation of permanent, temporary, or emergency orders of protection.

    c.    Afford protection and support to adult and child victims of domestic violence.

    d.    Promote the safety of law enforcement personnel responding to incidents of domestic violence.

    e.    Provide victims or witnesses of domestic violence with support and assistance through cooperative efforts with intervention and prevention organizations in order to prevent further abuse and harassment or both.

    f.    Complete thorough investigations and affect arrest of the predominant aggressor upon the establishment of probable cause.

(Filing No. 65-8 at CM/ECF pp. 4-5; Filing No. 65-10 at CM/ECF pp. 2-7.)

    44.    On March 18, 2010, Dr. Kent Lacey ("Lacey") diagnosed Villanueva with depression. In doing so, he discussed at length the stressors in her life and her coping mechanisms. He encouraged continued exercise with a stationary bike and removal of existing stress. He discussed treatment options like antidepressants and counseling. However, Villanueva indicated she was not interested in antidepressants

12

and that counseling had not been effective in the past.  (Filing No. 65-4 at CM/ECF p. 55.)

45.     On May 26, 2010, Villanueva followed up with Dr. Lacey.  She was still depressed, had lots of stress, was having headaches, and had gained weight.  (*Id*. at CM/ECF p. 54.)

46.     On July 15, 2010, Villanueva followed up with Dr. Lacey regarding her weight.  Lacey diagnosed her as overweight and depressed.  (*Id*. at CM/ECF p. 53.)

47.     Villanueva visited Dr. Lacey on February 10, 2012; April 9, 2012; June 7, 2012; and August 6, 2012.  During those visits, Villanueva was oriented to time, place, person, and situation.  She had normal insight, exhibited normal judgment, and demonstrated appropriate mood and effect.  (*Id*. at CM/ECF pp. 44-52.)

48.     Villanueva worked part-time for the Scottsbluff Public Schools until March 2012, when she quit because Moreno came to the school as part of the TeamMates program to mentor a student.  (Filing No. 65-2 at CM/ECF pp. 45-46.) Since April 2012, Villanueva has been working 24 to 32 hours a week for a private company.  (*Id*. at CM/ECF pp. 43-44.)

49.     Kathleen Youngs, a licensed professional counselor and a licensed mental health practitioner, began counseling Villanueva in May 2011. (Filing No. 65-7 at CM/ECF pp. 3-5.)

50.     Youngs is not a licensed psychiatrist or licensed psychologist and cannot prescribe medication.  (*Id*. at CM/ECF p. 13.)

13

51.     Youngs diagnosed Villanueva as having anxiety with depression in May 2011.  (*Id*. at CM/ECF p. 6.)  Villanueva stopped seeing Youngs in April 2012, but resumed counseling with Youngs in June 2012.  (*Id*. at CM/ECF pp. 9-11.)

52.     On June 19, 2012, Youngs diagnosed Villanueva as having post-traumatic stress disorder.  (*Id*. at CM/ECF p. 8.)  Youngs found the severe abuse by Villanueva's ex-husband contributed to her PTSD.  (*Id*. at CM/ECF pp. 11-12.)  Youngs found the death of Villanueva's father, death of her sister, and the end of her marriage contributed to Villanueva's depression.  (*Id*.)

53.     Youngs stopped counseling Villanueva in October 2012, but has since provided occasional counseling when Villanueva can afford to pay her private-pay rate.  (*Id*. at CM/ECF p. 14.)  Since October 2012, Youngs found Villanueva's condition had "improved," as she is engaging in outside activities and is employed.  (*Id*. at CM/ECF p. 15.)

54.     During counseling with Youngs, Villanueva never claimed that Moreno raped her, but rather indicated it was a consensual relationship.  (*Id*. at CM/ECF p. 16.)

55.     Villanueva told Youngs that when she had sex with Moreno she did not say "no."  (*Id*. at CM/ECF p. 17.)

## C.     Analysis

Defendants argue they are entitled to summary judgment because Villanueva has failed to prove the elements of (1) an equal protection claim, (2) a substantive due process claim, and (3) a claim for negligent infliction of emotional distress.  (Filing 64 at CM/ECF pp. 19-42.)  For the reasons discussed below, I agree with Defendants with respect to Villanueva's federal claims and will decline to exercise supplemental jurisdiction over Villanueva's remaining state law claim.

1.    *Equal Protection*

Villanueva alleges that the City and Moreno violated her equal protection rights by implementing a policy of treating domestic assaults differently than non-domestic assaults.  (Filing No. 20 at CM/ECF pp. 10-11.)  Villanueva  further alleges that this policy was motivated by an intent to discriminate against women.  (*Id*.)

In order to survive a motion for summary judgment on her equal protection claim, Villanueva must:

> proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom.

*Ricketts v. City of Columbia, Mo.*, 36 F.3d 775, 779 (8th Cir. 1994).

In *Ricketts*, an expert gathered statistics indicating that the Columbia Police Department made fewer arrests in domestic abuse cases than in nondomestic cases. *Id*. at 781.  The expert then testified that this custom aversely impacted women because women were the victims in 90% of domestic abuse cases. *Id*.  On appeal, the Eighth Circuit considered these statistics and acknowledged that they "took into account some of the variables that affect a decision to arrest in domestic disputes." *Id*. at 781–82.  However, the Eighth Circuit ultimately concluded that "not all of the differences that enter into the discretionary decision of whether to arrest can be properly assessed and quantified through statistics." *Id*. at 782.  In doing so, the Eighth Circuit stated that "[p]olice discretion is essential to the criminal justice process" and declined to "assume that what is unexplained is invidious." *Id*. (internal quotations omitted).  The Eighth Circuit also noted that "a more accurate indicator of intent to discriminate in this type of case would be a comparison of the arrest rate

15

when men are the victims of domestic abuse with the arrest rate when women are the victims." *Id*. at n.2.

Because statistical disparity alone did not signal an intent to discriminate against women, the Eighth Circuit moved on to consider other evidence in *Ricketts*. Indeed, "when determining whether there is a showing of discriminatory intent, disproportionate impact is but one factor to consider along with the inferences that rationally may be drawn from the totality of the other relevant facts." *Id.* at 781. The other evidence included hearsay statements "allegedly made by a police officer to the effect that one man accused of domestic abuse should have been arrested before but was not," and evidence of a historic tolerance of domestic abuse in society. *Id.* Ultimately, the Eighth Circuit concluded that this evidence did not "combine to create a submissible inference of discriminatory animus toward women by the Columbia police department." *Id.*

To support her claim that the City and Moreno have an intent to discriminate against women, Villanueva argues that they failed to properly respond to (a) her reports of domestic abuse by her ex-husband, (b) her reports of harassment, (c) a report that Megan Mitchell ("Mitchell") was being harassed, and (d) a report of sexual assault made by Hayley Loch ("Loch"). I will consider each assertion in turn.

a.     Villanueva's Reports of Domestic Abuse

It is undisputed that in late August 2010, Villanueva met with Moreno in his office and disclosed that she had been abused by her ex-husband. (Filing No. 20 at CM/ECF p. 3;  Filing No. 29 at CM/ECF p. 2; *see also* Filing No. 66-3 at CM/ECF pp. 6-7.)  It is also undisputed that Villanueva talked with Moreno about her personal history with domestic violence at this meeting.  (Filing No. 65-5 at CM/ECF pp. 12-13.)  Villanueva has submitted evidence suggesting she informed Moreno that her ex-husband had assaulted her the day before this meeting. This evidence also suggests

16

that Villanueva's ex-husband later met with Moreno and confirmed the assault, but Moreno failed to file a report. (Filing No. 66-3 at CM/ECF p. 2; Filing No. 65-2 at CM/ECF pp. 11-12; Filing No. 66-4 at CM/ECF pp. 1-2.)

Despite Moreno's alleged failure, the undisputed evidence also shows at least two instances when Police Department did respond to Villanueva's domestic complaints. The first occurred in the summer of 2008 when Villanueva complained about her husband to the Communications Center and two officers responded. (Filing No. 65-2 at CM/ECF p. 4.) The second occurred on August 15, 2011, when Officer Broderick responded to Villanueva's domestic violence call, arrested her ex-husband, and transported him to the Scotts Bluff County jail. (Filing No. 65-8 at CM/ECF p. 5; Filing No. 65-10 at CM/ECF pp. 9-13.)

           b.    Villanueva's Reports of Harassment

Villanueva submitted evidence suggesting that Moreno and the Police Department may have failed to respond to some of her reports of harassment (i.e. harassment regarding her relationship with Moreno). (*See, e.g.,* Filing No. 66-1 at CM/ECF pp. 32-33, 35-36; Filing No. 66-3 at CM/ECF pp. 4, 14-23.) Because Moreno and Villanueva had an intimate relationship, threats and harassment orchestrated by Moreno could arguably be considered domestic in nature. *See generally* Neb. Rev. Stat. § 28-323 (providing that within the context of domestic assault statute, an "intimate partner" can include someone in a dating relationship, defined by frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement). However, Villanueva has submitted no evidence, other than her own speculation, to suggest that Moreno was behind the alleged threats and harassment. Indeed, on May 11, 2011, Villanueva filed a petition and affidavit to obtain a harassment protection order against Moreno. (Filing No. 65-3 at CM/ECF pp. 19-24.) The court denied the petition because it contained "insufficient factual allegations." (*Id.* at CM/ECF p. 23.) Speculation and conjecture

are insufficient to defeat summary judgment.  *See Beaulieu v. Ludeman*, 690 F.3d 1017, 1024 (8th Cir. 2012).

>        c.        Report that Megan Mitchell was Being Harassed

Villanueva has also submitted an affidavit from Doni Abreu ("Abreu"). (Filing No. 66-6.)  In this affidavit, Abreu states that in the fall of 2010, he talked with Moreno about a problem his friend Mitchell was having with her ex-boyfriend Dominic Marquez ("Marquez").  (*Id.*)  Abreu reported that Mitchell was being harassed by individuals who were "threatening her on Dominic's behalf."  (*Id*. at CM/ECF p. 2.)  Abreu reported that these individuals followed Mitchell from Scottsbluff to her home in Torrington, Wyoming, and raped her.  (*Id*.)  After informing Moreno of the situation, Abreu states that he told Moreno to contact detective Weeks with the Torrington Police Department.  (*Id*.)

After this initial report, Abreu states that he had another conversation with Moreno and reported that "individuals were still harassing and following [Mitchell] in Scottsbluff."  (*Id*.)  He asked "Moreno if the police could make a presence at our place of work to get the individuals to stop waiting for [Mitchell] there."  (*Id*.)  Abreu states that the Police Department did not send anyone to address the situation.  (*Id*. at CM/ECF pp. 2-3.)

Ultimately, Daniel Morgan ("Morgan"), who began dating Mitchell in July 2010, shot and killed Marquez on May 13, 2011.  *See State v. Morgan*, 837 N.W.2d 543, 547-48 (Neb. 2013).  Villanueva has submitted a transcript from Morgan's trial indicating that Moreno was aware of the tension between Morgan and Marquez and had advised Morgan to stay away from Marquez. (Filing No. 66-7 at CM/ECF p. 7.)

18

Overall, Villanueva argues that Moreno's handling of the Mitchell situation shows that he did not take complaints of domestic violence seriously. (Filing No. 67 at CM/ECF p. 23.) Although Villanueva may disagree with the level of service Moreno provided to Mitchell, she fails to adequately explain how his actions demonstrate a policy or custom to provide less protection to victims of domestic violence. Indeed, the evidence shows that Moreno did not ignore the situation. Rather, he advised Abreu to report the alleged rape that occurred in Torrington, Wyoming, to a Torrington detective, and he advised Morgan to stay away from Marquez. (Filing No. 66-6 at CM/ECF p. 2; Filing No. 66-7 at CM/ECF p. 7.)

        d       Report of Sexual Assault by Hayley Loch

Villanueva also argues that the Police Department failed to take seriously a sexual assault complaint by another individual, Hayley Loch ("Loch"). (Filing No. 67 at CM/ECF p. 23.) However, Villanueva's evidence regarding Loch's complaint contains a letter from the Scotts Bluff County Attorney's Office declining to file assault charges because Loch "made a false report." (Filing No. 33.)

In short, the evidence in this matter, as it pertains to an equal protection claim, is less substantial than the evidence submitted by the plaintiffs in *Ricketts*. Villanueva has not presented any statistics showing that the City's alleged polices or customs adversely affected women. Moreover, the evidence presented does not combine to create a submissible inference of discriminatory animus toward women by Moreno or the City. Accordingly, no reasonable juror could find that Villanueva was injured as a result of a widespread policy or custom that was intended to discriminate against women.

19

    2.    *Substantive Due Process*

    In addition to her equal protection claim, Villanueva asserts substantive due process claims against the City and Moreno.  (Filing No. 20.)  These claims can be fairly described as follows: (a) Moreno failed to report Villanueva's claim of domestic abuse, leaving her more vulnerable to the danger of her ex-husband's abuse or some other potential harm, and (b) Moreno engaged Villanueva in a sexual relationship that violated her bodily integrity and was shocking to the conscience.  I will explore each claim in detail below.

    a.    Failure to Report

    The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  However,  "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) (holding that the failure of the county's Department of Social Services to provide a child with adequate protection against his father's violence did not violate the child's substantive due process rights).  Moreover, the Due Process Clause does not "transform every tort committed by a state actor into a constitutional violation."  *Id.* at 202.

    The Eighth Circuit has recognized two exceptions to the general rule that a state has no duty to protect its citizens.  *Beck v. Wilson*, 377 F.3d 884, 888 (8th Cir. 2004).  These exceptions are known as the "special relationships" and "state-created danger" exceptions.  *DeShaney*, 489 U.S. at 197–202.  Villanueva's substantive due process claim relating to Moreno's failure to report or investigate her claim of domestic abuse arises under the state-created danger doctrine.  To succeed on a state-created danger theory of liability, Villanueva must prove (1) that she was a member of "a limited,

precisely definable group," (2) that the municipality's conduct put her at a "significant risk of serious, immediate, and proximate harm," (3) that the risk was "obvious or known" to the municipality, (4) that the municipality "acted recklessly in conscious disregard of the risk," and (5) that in total, the municipality's conduct "shocks the conscience." *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011) (quoting *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005)).

Concerning the last factor—conduct that shocks the conscience—the Eighth Circuit in *Fields* stated that:

> [t]he constitutional concept of conscience shocking duplicates no traditional category of common-law fault. Actionable substantive due process claims involve a level of abuse of power so brutal and offensive that they do not comport with traditional ideas of fair play and decency. Under the state created-danger theory, negligence and gross negligence cannot support a § 1983 claim alleging a violation of substantive due process rights. And proof of intent to harm is usually required, but in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold.

*Id*. (internal quotations, citations, and brackets omitted).

As discussed above, Villanueva submitted evidence suggesting that in late August 2010, she informed Moreno that her ex-husband had assaulted her and that Moreno failed to file a report. (Filing No. 66-3 at CM/ECF p. 2; Filing No. 65-2 at CM/ECF pp. 11-12; Filing No. 66-4.) Villanueva alleges this failure placed her "at a significant risk of serious, immediate, and proximate harm." (Filing No. 20 at CM/ECF p. 12.) However, Moreno's failure to file a report was not an affirmative act; it was an omission.[1] Stated another way, Moreno's failure did not increase the

---

[1]Villanueva also argues that Moreno "made no efforts to contact" her ex-husband regarding the report. (Filing No. 67 at CM/ECF p. 4.)

danger of significant harm to Villanueva, it merely placed her in the same situation that she was in when she reported the domestic abuse. The state-created danger doctrine requires an affirmative act or conduct placing someone in danger that he or she would not otherwise have faced. *See, e.g.,* *S.S. v. McMullen*, 225 F.3d 960, 962-63 (8th Cir. 2000) (discussing the distinction between action and inaction; concluding that three employees of the Missouri Division of Family Services did not violate a S.S.'s due process rights when they released her from state custody and returned her to her father's custody, even though they knew that her father was allowing her to have contact with a known pedophile who subsequently sodomized her on at least two occasions); *see also* *Robinson v. Lioi*, 536 Fed. App'x. 340, 344 (4th Cir. 2013) (acknowledging that the state-created danger exception is a narrow one; for the doctrine to apply there must be an affirmative act); *Culp v. Rutlege*, 343 Fed. App'x. 128, 136 (6th Cir. 2009) (stating "any failure by Sergeant Cooper to follow up on Jamika's domestic violence claim constitutes inaction, which does not qualify as an affirmative act under a state-created danger theory"); *Jones v. Reynolds*, 438 F.3d 685, 691-92 (6th Cir. 2006) (stating a "failure to act is not an affirmative act under the state-created danger theory" (collecting cases)). Accordingly, Moreno's failure to report or act upon Villanueva's claim of domestic abuse did not violate her substantive due process rights because it did not place her place her at a significant risk of serious, immediate, and proximate harm.

To the extent Villanueva alleges that the City or Moreno placed her in danger by failing to respond to her reports of threats and harassment from individuals other than her ex-husband, such allegations also fail to establish a substantive due process violation. Indeed, Villanueva has not presented any evidence identifying who threatened or harassed her. Although she alleges that Moreno directed people to harass her and discouraged police responses to her harassment complaints (*see* filing no. 20 at CM/ECF p. 9; filing no. 67 at CM/ECF p. 27), Villanueva has submitted no evidence, other than her own uncorroborated speculation, to support these allegations. *See* *Beaulieu*, 690 F.3d at 1024 (explaining "'speculation and conjecture are

insufficient to defeat summary judgment'" (quoting *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006))).

        b.     Sexual Relationship

      Villanueva also alleges that Moreno violated her substantive due process rights by engaging in a sexual relationship with her. (Filing No. 20 at CM/ECF p. 12; Filing No. 67 at CM/ECF p. 26.) To establish a substantive due process rights violation, Villanuvea must show that Moreno violated one or more fundamental constitutional rights and that his conduct was shocking to the contemporary conscience. *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007). In an effort to accomplish this task, Villanueva cites *Rogers v. City of Little Rock*, 152 F.3d 790 (8th Cir. 1998). (Filing No. 67 at CM/ECF p. 26.)

      In *Rogers*, an officer stopped a woman for driving with a broken tail light and discovered that she did not have the appropriate paperwork. *Rogers*, 152 F.3d at 793. The officer initially called for a tow, but decided to cancel it, and followed the woman to her house. *Id*. The woman was unable to locate the paperwork and the officer told her he would let her off, but that she owed him one. *Id*. The officer then started touching and kissing the woman. *Id*. He asked her to undress, forced her onto the bed, and had sexual intercourse with her. *Id*. at 793-94. The woman testified that she was in shock and afraid during the encounter and was intimidated by the officer's gun and badge. *Id*. at 794.

      The district court concluded the officer was liable under § 1983 because he violated the woman's due process right to be free from physical abuse. *Id*. On appeal, the Eighth Circuit agreed, concluding that the evidence supported a conclusion that the woman suffered a violation of her right to intimate bodily integrity that was conscience-shocking. *Id*. at 797. The Eighth Circuit also said the case involved an "egregious, *nonconsensual* entry into the body which was an exercise of power

23

without legitimate governmental objective." *Id*. (emphasis added). "It therefore violated Rogers' substantive due process right." *Id*.

In contrast to *Rogers*, Villanueva's encounter with Moreno was not the result of a traffic stop or any other legal violation. Indeed, it started in October 2008 when Villanueva began working with Moreno to establish a neighborhood watch group. (Filing No. 65-2 at CM/ECF p. 8.) This relationship eventually progressed to a kiss at a neighborhood watch meeting in October 2010. (*Id*. at CM/ECF p. 14; Filing No. 20 at CM/ECF p. 4.) After this meeting, Villanueva continued to talk, text, and otherwise communicate with Moreno. (Filing No. 65-2 at CM/ECF pp. 14-16; Filing No. 20 at CM/ECF p. 4.) Moreno and Villanueva ultimately engaged in intercourse on two separate occasions; each time Villanueva voluntarily met Moreno at a lake house. (Filing No. 20 at CM/ECF p. 5; Filing No. 29 at CM/ECF p. 3; Filing No. 65-2 at CM/ECF p. 19.) After November 15, 2010, Villanueva refused to have intercourse again with Moreno. (Filing No. 20 at CM/ECF p. 5; Filing No. 65-2 at CM/ECF p. 20.) Villanueva subsequently attended counseling sessions where she indicated that her relationship with Moreno was consensual. (Filing No. 65-7 at CM/ECF p. 16.)

Despite the significant differences between *Rogers* and this case, Villanueva argues that a substantive due process violation occurred because she was mentally vulnerable and Moreno "used his role as the chief of police to continue contact with [her] and to coerce her into a sexual relationship." (Filing No. 67 at CM/ECF p. 31.) However, Villanueva has failed to submit evidence showing that she did not have the capacity to consent. In fact, the evidence shows the opposite. Villanueva reported to her counselor that "she did not say no" during her sexual interactions with Moreno and in the counselor's opinion "that can only mean that it was consensual." (Filing No. 66-2 at CM/ECF p. 26; Filing No. 65-7 at CM/ECF p.16-17.) This counselor's opinion is the same one that Villanueva argues could form the basis for a jury's reasonable inference that Villanueva was "incapable of consenting." (Filing No. 67 at CM/ECF p. 34.) Further, Villanueva demonstrated her ability to say "no" when she

24

refused to have intercourse with Moreno after November 15, 2010.  (Filing No. 65-2 at CM/ECF p. 20.)

In sum, Villanueva has failed to submit evidence sufficient to (1) create an inference of discriminatory animus toward women by Moreno or the City or (2) suggest that Moreno or the City somehow violated her substantive due process rights. Accordingly, I will grant Defendants' Motion for Summary Judgment with respect to Villanueva's federal claims.

3.     *Supplemental Jurisdiction*

Villanueva's remaining claim of negligent infliction of emotional distress is brought pursuant to state law.  I decline to exercise supplemental jurisdiction over this claim because Defendants are entitled to summary judgment on all claims over which the court had original jurisdiction.  28 U.S.C. § 1367(c)(3).  However, I will dismiss Villanueva's negligent infliction of emotional distress claim without prejudice to reassertion in the proper forum.

IT IS ORDERED:

1.     Defendants' Motion to Strike (filing no. 72) is denied.

2.     Defendants' Motion for Summary Judgment (filing no. 63) is granted in part.

3.     Villanueva's equal protection and substantive due process claims are dismissed with prejudice.

4.     Villanueva's state law claim for negligent infliction of emotional distress is dismissed without prejudice.

5.     A separate judgment will be entered in accordance with this memorandum and order.

DATED this 4th day of March, 2014.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

_____

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.